UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

WADE AND SHEILA THERIOT          CIVIL ACTION

NO.: 6:14-cv-02475-RFD-PJH

VERSUS

JUDGE:  DOHERTY

DIAMOND OFFSHORE DRILLING, INC.
ET AL                          MAGISTRATE:  HANNA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' 12(f) MOTION TO
STRIKE PUNITIVE DAMAGE CLAIM AND DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Wade and Sheila

Theriot, who file the instant opposition to Defendants' 12(f) Motion to Strike Plaintiffs' Punitive

Damage Claim and Defendants' Motion for Partial Summary Judgment that requests summary

dismissal of Plaintiffs' punitive damage claim.

## INTRODUCTION

Diamond attempts to characterize the accident at issue as a simple ac t of negligence on the

part of Wade Theriot and/or a third-party company and that Diamond did all it could to avoid the

accident and had acted proactively to provide a safe working environment on the OCEAN

VICTORY.  Diamond went so far as to say that the accident happened "in spite of and not because

of company policy."  Nothing could be further from the truth.  Diamond allowed a septic

environment to exist on board the OCEAN VICTORY and it was Diamond's corporate actions

that will subject it to punitive damages in this case.

## <u>SUMMARY OF THE FACTS</u>

Prior to Wade Theriot's accident, William Rousseau, a Diamond employee and member of the crew of the OCEAN VICTORY, and others on board the OCEAN VICTORY were subjected to extreme mental and physical abuse on board the OCEAN VICTORY.  As a result of this, William Rousseau attempted to alert not only his supervisors, but Diamond personnel in Diamond's corporate offices of the problems on the OCEAN VICTORY.  Diamond, however, turned a blind eye to these complaints and even allowed the conditions on the OCEAN VICTORY to get worse with each successive complaint of William Rousseau.  Ultimately, Diamond allowed an environment to exist where crewmembers were fearful to voice their complaints and even ignored clearly egregious actions including drug abuse on board the OCEAN VICTORY.

On the night of Wade Theriot's accident, three (3) diamond crew members noticed that there was something wrong with Robert Stanford, the skate operator, and that he was not paying attention to his duties.  Unfortunately, and as a result of the prior abusive actions of Robert Stanford and Diamond's supervisors' inaction, not one of those crew members addressed their concerns with Mr. Stanford or alerted the driller in charge of the drill floor.  That silence nearly proved fatal for Wade Theriot as Mr. Stanford was not even looking at the drill floor at the time of the accident although he was operating the skate that was bringing casing pipe off the drill floor and he did not hear a co-worker standing within a few feet of Mr. Stanford yell that the joint of casing had gotten hung up in the derrick.  Mr. Stanford, oblivious to what was happening on the drill floor, continued to move the skate away from the floor and the casing joint was allowed to swing back in and crush Mr. Theriot between the joint of casing and the stump of casing pipe sticking out from the drill floor.

2

As alluded to above, there were three (3) Diamond crew-members in addition to Robert Stanford on the drill floor at the time of the accident.  Each of these co-workers had noticed and specifically spoken with one another about the problems they noticed with Mr. Stanford.  However, because of the prior abusive actions of Mr. Stanford and the inaction on the part of Diamond, not one of them did anything to alert anyone of what they were witnessing.  More troubling, though, is the fact that each of these crew-members specifically saw that Mr. Stanford was not paying attention to what he was doing and confided in one another that the accident was Mr. Stanford's fault.  However, in the post-accident meetings, not one of those co-workers advised Diamond's alleged investigative crew that Mr. Stanford was at fault for the accident.  The reason for that is because the post-accident meetings were held with everyone present and the witnesses to the accident did not want to speak up out of both fear and because Diamond had made it known that they did not want to listen to those individuals' opinions.  And although they were scared to speak up in a large group, each of those individuals met with the driller, Daniel Midkiff, and the assistant driller, Earl Barkley, and advised that the accident was a result of the extreme negligence of Robert Stanford.  Not surprisingly, that information never made it into any of Diamond's post-accident investigations.  Diamond remained content to simply blame the accident on Wade Theriot.

Following the accident, however, conditions on the OCEAN VICTORY did not improve. William Rousseau and David Brewer, crew-members of Diamond, continued to be harassed by Robert Stanford and the other crew-members on board the OCEAN VICTORY and Diamond's supervisory personnel both on the OCEAN VICTORY and on land continued to ignore these complaints.  David Brewer ended up leaving Diamond because of the extreme behavior being exhibited toward him.  Mr. Rousseau, however, finally had enough and contacted Diamond's HR department and eventually showed up at Diamond's Corporate Headquarters and had a meeting

with several of Diamond's top executives, including the VP of Health, Safety & Environment (HS&E) and Diamond's VP of Operations.   At that meeting, Mr. Rousseau advised of the egregious behaviors on board the OCEAN VICTORY including, rampant abuse of prescription medication (Adderall), verbal and physical abuse perpetrated by Robert Stanford, verbal assaults by other crew-members, that another employee (David Brewer) had been forced to resign and that Diamond should contact that employee, that the supervisory personnel on the OCEAN VICTORY would only perform JSA's when third-parties were present and that they had actually falsified JSAs in the past, that the individual primarily responsible for the accident with Wade Theriot was the main perpetrator in the verbal and physical assaults, and that Mr. Rousseau had between 5-8 audio recordings that could back up his statements.

Diamond's response was less than pathetic.  The VP of HS&E did nothing,[1] and the VP of Operations sent out a single email (which has never been produced despite repeated requests)[2] to the Operations Manager and the OIM onboard the OCEAN VICTORY to check some complaints made by Wade Theriot (the VP of Operations could not even recall what complaints he asked them to check up on) and the investigation was concluded the next day with a phone call that the Operations Manager and OIM could not find any evidence of the complaints and they had a meeting with the crew-members to reset company expectation.[3]  To call that an investigation is laughable.

The testimony of both VPs made clear that Diamond's actions were callous and indifferent. Neither one even recalled that Mr. Rousseau made a complaint that he was physically assaulted on

---

[1] Deposition of Neil Hall, attached hereto as Exhibit A, pages 30-31 and page 75.
[2] Deposition of Jon Richards, attached hereto as Exhibit B, pages 35-39.  It is also noted that Plaintiffs have requested in discovery any and all documents prepared by Diamond as a result of the meeting William Rousseau had with Diamond discussing his complaints and the email discussed by Jon Richards has never been produced.  Further, at the deposition it was discussed and Mr. Richards indicated that he could retrieve the email and undersigned requested on the record that Diamond supplement its discovery responses with that email.  To date nothing has been produced.
[3] Exhibit B, Deposition of Jon Richards, pages 35-39, pages 51-53.

the OCEAN VICTORY despite that issue being included in the interoffice memorandum that was prepared as a result of the phone call Mr. Rousseau made to the HR department in the days immediately prior to the meeting.[4]   When pressed on this, the VP of HS&E made clear that was a serious allegation and Diamond should have looked into it.   The VP of Operations, on the other hand, simply testified that he did not recall such a complaint and that he found that hard to believe because a physical assault would constitute a federal offense.[5]   When pressed on the allegations that HS&E documents were falsified and that JSAs were not being properly covered, the VP of HS&E was not even aware of that despite such topic was covered in the interoffice memorandum and the VP of Operations confirming that William Rousseau discussed that issue at the meeting.[6] While these actions are quite hard to stomach, the VP of Operations shed some light onto why it was such a haphazard investigation.   Specifically, he testified that despite not knowing Mr. Rousseau prior to meeting him that morning, that he believed Mr. Rousseau was a smart man and the he had an ulterior motive in voicing his complaints to try and get a transfer to a position with more permanency.[7]   That testimony completed the circle.   Diamond's corporate representatives, just like those on board the OCEAN VICTORY, turned a blind eye to the actions on board the OCEAN VICTORY and dismissed William Rousseau as a liar.   It is that callous indifference which has been exhibited from the top down that allowed the septic environment to permeate on board the OCEAN VICTORY.   The personnel on board the OCEAN VICTORY were subjected to both physical and mental abuse by co-workers, there was prescription drug abuse, the personnel were not properly covering the JSAs, there was falsification of JSAs, and the crewmembers had become

---

[4] *See,* Interoffice Memorandum delineating complaints of William Rousseau attached hereto as Exhibit C; *see also,* Exhibit A, Deposition of Neil Hall, pages 54-59.
[5] Exhibit B, Deposition of Jon Richards, page 55.
[6] Exhibit A, Deposition of Neil Hall, pages 62-66.
[7] Exhibit B, Deposition of Jon Richards, pages 60-62.

so indoctrinated into this that they would ignore negligent actions of their co-workers and were even scared to come forward with the truth following an accident that nearly took a man's life.

It also must be stressed that at the meeting between the VPs and Mr. Rousseau that Mr. Rousseau advised there was drug abuse on board the OCEAN VICTORY and that one of the main culprits was the skate operator, Robert Stanford.[8]  That statement becomes very important because there were three (3) members of the crew on the night of the accident that noticed Mr. Stanford was acting strangely.[9]  Further, we know there was reason to suspect drug use in the accident as Jon Richards, the VP of Operations, testified that the operations representative for the OCEAN VICTORY was interested in the results of the drug test.[10]  What was most peculiar about those drug tests, however, is that they were not conducted until February 26, 2014, 5 days after the accident.[11]  Any results of such testing would be worthless as they would not be able to show what was in any of the employee's system at the time of the accident.  Further, we know that as a result of Rousseau's complaints that Diamond did perform drug tests on crew-members of the OCEAN VICTORY.[12]  However, Diamond has failed to produce those results.[13]  This is one of those scenarios where everything doesn't quite add up and there is clear circumstantial evidence pointing to the fact that Diamond was aware that drug use could have been involved in the accident and they did what they could to shield themselves, and their employees, from having to face that result.

In the end, the accident in question was absolutely the result of Diamond's corporate behavior and to suggest that it was merely an act of negligence exhibits Diamond's callous

---

[8] Exhibit A, Deposition of Neil Hall, pages 44-45; Exhibit B, Deposition of Jon Richards pages 45-47
[9] Deposition of William Rousseau, attached hereto as Exhibit D, pages 69-72.
[10] Exhibit B, Deposition of Neil Hall, pages 42-43.
[11] *See,* Diamond correspondence dated February 26, 2014 stating that the drug tests still had not been performed, attached hereto as Exhibit E; *see also,* drug test results showing samples not obtained until February 26, 2014, attached hereto as Exhibit F.
[12] Exhibit A, Deposition of Neil Hall, pages 44-46.
[13] *See,* Diamonds' Responses to Requests for Production of Documents, attached hereto as Exhibit G.

disregard for its own reprehensible conduct.   This accident should never have happened. Diamond's actions in blatantly ignoring the complaints of its crew-members allowed the septic environment on board the OCEAN VICTORY to proliferate.   It was that environment which allowed the accident to happen and it was also that environment that facilitated the cover-up of the true facts as to what happened.   Fortunately, Mr. Rousseau was strong enough in his convictions to continue to voice his concerns when no one on the OCEAN VICTORY would listen and even went so far as to jeopardize his employment by testifying to the true working conditions on board the OCEAN VICTORY.   Unfortunately, Diamond's actions have now even had a stifling effect on Mr. Rousseau.   Specifically, the audio tapes that Mr. Rousseau was quick to point out in the deposition that he still had[14] have since been destroyed following Mr. Rousseau's lay-off from Diamond.[15]

The evidence that will be presented at trial will show that Diamond acted with reckless and callous indifference to the conditions on the OCEAN VICTORY and that such actions were directly responsible for the injuries that Wade Theriot sustained.   Further, the jury will be able to see that Diamond chose to cover-up the true facts behind the accident despite both its VP of HS&E and its VP of Operations being told by a witness who was standing only a few feet of Wade Theriot at the time of the accident that the skate operator was primarily at fault.[16]   Such evidence could and should result in the imposition of punitive damages and summary dismissal of such claims is wholly inappropriate.

---

[14] Exhibit D, Deposition of William Rousseau, page 50.
[15] *See,* Correspondence from William Rousseau setting forth that he no longer has the audio tapes and does not have access to them, attached hereto as Exhibit H.
[16] Exhibit D, Deposition of William Rousseau, pages 155-156.

## PUNITIVE DAMAGES AVAILABLE UNDER THE LAW

It is important to start with Defendants' assertion that punitive damages are not available to Wade Theriot, a non-seaman, pursuant to the general maritime law.  Defendants correctly point out that it is undisputed that Plaintiffs' claims are rooted under the general maritime law of negligence pursuant to 905(b) of the LHWCA which is made applicable by virtue of the Outer Continental Shelf Lands Act.  That is an important admission on the part of all parties as it is that admission that absolutely establishes that punitive damages are available as a matter of law to non-seaman injured in both territorial waters and non-territorial waters.

In their brief, Defendants go through a history of the availability of punitive damages to non-seaman injured *on the high seas* in an attempt to paint a muddled picture to show that the law is in a state of flux in order to discredit the opinion of Judge Patricia Minaldi who ruled that punitive damages are available to non-seaman injured *on the high seas* in the wake of both *Miles* and *Townsend.*  Specifically, Defendants rely on the recent decision of the Fifth Circuit in *McBride v. Estis Well Serv., LLC,* 768 F.3d 382 (5th Cir. 2014) *cert. denied,* 135 S.Ct. 2310, 191 L.Ed. 2d 978 (2015), to suggest that the tides have somehow turned and that punitive damages are no longer available in a negligence action under the general maritime law.  That statement is absolutely flawed and also ignores recent case law wherein the Eastern District of Louisiana held in March of this year that the general maritime law does recognize a claim for punitive damages for negligence if the claim is not made by a seaman against his employer.

On this issue, Plaintiffs direct the Court's attention to the 2013 decision of Judge Minaldi here in the Western District of Louisiana wherein she held that punitive damages where available pursuant to 905(b) of the Longshore and Harbor Workers' Compensation Act for injuries sustained outside Louisiana's territorial waters.  *Callahan v. Gulf Logistics, LLC,* 6:06-CV-0561-PM-KK,

8

2013 WL 5236888 (W.D.La. Sept. 16, 2013). As is readily apparent, that case is on all fours with the instant facts.  Judge Minaldi, after thoroughly discussing both *Miles* and *Townsend,* declared that:

> As a result of the Supreme Court's recent assertion in *Townsend,* and its clarification of its holding in *Miles,* it seems clear that punitive damages are available for actions under general maritime law unless Congress has expressly forbade such availability.  The Court finds nothing in the language of 905(b) which could be construed as so limiting the availability of punitive damages in a negligence action under the LHWCA.[17]

Following that decision, the Fifth Circuit did grant writs in *McBride* and addressed a claim regarding punitive damages.  However, that claim was by a Jones Act seaman asserting a Jones Act claim for negligence and a general maritime law claim for unseaworthiness.  The Fifth Circuit, addressing the Supreme Court's prior decision in *Miles,* noted that Congress, by incorporating FELA unaltered into the Jones Act, limited a Jones Act seaman's recovery to pecuniary losses only for a Jones Act negligence claim.  The Fifth Circuit went on to note that its

> place in the constitutional scheme does not permit us 'to sanction more expansive remedies in a judicially created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence.  We must conclude that there is no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman.'[18]

The Fifth Circuit's language there was clear and unmistakable.  Congress, in enacting the Jones Act, limited a seaman's recovery for negligence to pecuniary losses only.  Our courts could not be allowed to side-step Congress' actions and provide for greater recovery to seaman through a general maritime law claim for unseaworthiness, which the Supreme Court noted was a system

---

[17] *Callahan v. Gulf Logistics*, LLC, 6:06-CV-0561-PM-KK, 2013 WL 5236888 (W.D.La. Sept. 16, 2013); attached hereto as Exhibit I.
[18] *McBride v. Estis Well Serv., LLC,* 768 F.3d 382 (5th Cir. 2014) cert. denied, 135 S.Ct. 2310, 191 L.Ed. 2d 978 (2015)

that placed liability on the vessel owner without a need to find actual fault on the part of the vessel owner.  Based on that holding, the Fifth Circuit in *McBride* held that neither a seaman nor his estate could assert a punitive damage claim as such damages were not available under a Jones Act negligence claim or a general maritime law claim for unseaworthiness.  The *McBride* decision has absolutely nothing to do with a general maritime law claim for negligence and cannot be used to ignore this Court's prior ruling that punitive damages are available pursuant to a general maritime law negligence claim.  Further, the Eastern District of Louisiana recently affirmed that punitive damages are available in a negligence claim brought pursuant to the general maritime law.

Specifically, in *Hume v. Consolidated Grain & Barge, Inc.,* 15-0935-JZ (E.D.La. 2016), 2016 WL 1089349, the Eastern District was faced with a motion to dismiss the plaintiff's claims for punitive damages under the general maritime law.[19]  The Court, addressing both *Miles* and the Fifth Circuit's decision in *McBride,* set forth that its prior rulings that punitive damages are available under general maritime law against a non-employer third party remained good law.  The Court specifically stated:

> Here, the Jones Act has no bearing on Plaintiffs' claims against Quality Marine.  As far as Quality Maring is concerned, "it should make no difference whether the Plaintiff was a seaman, a longshoreman, or a passenger.[20]

The Court's discussion made clear that in the wake of *Miles, Townsend* and *McBride* that punitive damages are available under the general maritime law if the Jones Act is not implicated.  Here, all parties have stipulated that the Jones Act is not implicated.  The court's ruling in *Hume* makes absolutely clear that Judge Minaldi's decision in *Callahan* remains unaffected by *McBride.*

---

[19] The plaintiff in *Hume* was a Jones Act seaman but the punitive damage claims were being asserted against a non-employer third party and as such were rooted in negligence under the general maritime law and not the Jones Act or unseaworthiness.
[20] *Hume v. Consolidated Grain & Barge, Inc.,* 15-0935-JZ (E.D.La. 2016), 2016 WL 1089349, pg. 3; attached hereto as Exhibit J.

## STANDARD FOR AWARDING PUNITIVE DAMAGES

Moving on, the rest of Defendants' arguments, both in their 12(f) motion and their motion for partial summary judgment, center on the fact that punitive damages cannot be awarded in this case as this was an isolated act of negligence and punitive damages are only available for actions that are "willful, wanton, reckless" or for "callous indifference" and that can be imputed to Diamond as a corporate entity.  While Diamond's classification of the facts here are inappropriate, their statement of the law is correct.  Punitive damages are not available simply for mere negligence or for even grossly negligent acts of an employee.  The seminal case in the Fifth Circuit on this issue is *Matter of P&E Boat Rentals, Inc.,* 872 F.2d 642, 1989 AMC 2447 (5th Cir. 1989). In that case, the Fifth Circuit made clear that a corporation cannot be held liable for punitive damages unless the action was carried out by a principal/manager of the corporation or if the act/actions were ratified by a principal/manager of the corporation.  Here, and despite Diamond's self-aggrandizing statements to the contrary, Diamond's upper management acted with callous indifference to the rights of the individuals working on board the OCEAN VICTORY and Diamond's upper management covered up the true actions that led to Wade Theriot's life changing accident.  Plaintiffs are not attempting to hold Diamond liable for punitive damages for the actions of Robert Stanford; the jury will properly hold Diamond accountable for those acts through the compensatory damage award.  Plaintiffs are seeking punitive damages against Diamond for the callous indifference Diamond exhibited as to the complaints being levied against both Robert Stanford and the other members of the crew onboard the OCEAN VICTORY as well as Diamond's shameful acts following the accident that covered up the true cause of the accident that were carried out by Diamond's top executives.

## **BURDEN OF PROOF**

Before the Court are two motions requesting summary dismissal of Plaintiffs' punitive damage claims.  The first is a Rule 12(f) motion and the second is a motion for partial summary judgment.  The Rule 12(f) motion attempts to set forth that Plaintiffs' pleadings alone fail to state a cause of action for punitive damages.  That is absolutely incorrect.  Plaintiffs' pleadings set forth that the accident was a direct result of the callous indifference and gross negligence on the part of Diamond, both before and after the accident and that Diamond's actions both before and after the accident acted as a tacit ratification of the abhorrent behavior being exhibited on the OCEAN VICTORY that directly led to the accident in question.  More importantly, Diamond's own brief belies its position.  Specifically, Diamond set forth in its 12(f) motion that for a corporate entity to be held liable for punitive damages that "a corporate official with policy-making authority participated in, approved or, or subsequently ratified the egregious conduct."  That is exactly what has been alleged and that is exactly what the testimony of William Rousseau and Diamond's VPs support.

Next, the Court is reminded that to prevail on a motion for summary judgment Diamond has to establish, as a matter of law, that there is no evidence that would allow a reasonable person to conclude that Diamond acted grossly negligent or with callous indifference and that such actions were a contributing factor to the accident.  Further, in making this determination the Court is reminded that it cannot weigh the evidence or seek to ascertain the truthfulness of any witness' testimony and that all inferences to be garnered from the evidence must be interpreted in light of the non-moving party.  On this point it is instructive to look to the language of this specific court in denying a motion for summary judgment on a punitive damage claim in a maintenance and cure case which sets forth the applicable burden of proof:

Considering the burden of production associated with summary judgment motions, the legal presumptions which attach to evidence produced by a non-movant, and the prohibition against weighing evidence in this context, this Court finds plaintiff has produced sufficient evidence regarding whether defendants' termination of payments of maintenance and/or cure was arbitrary and capricious to demonstrate the existence of a genuine issue of material fact.[21]

As set forth in great detail below, there are ample facts to suggest that Diamond acted grossly negligence and with a careless disregard for the rights of its employees and allowed an absolutely intolerable environment to exist on board the OCEAN VICTORY and it is that intolerable environment that led to the instant accident.  As such, Plaintiffs pray that the instant motions be denied.

## DIAMOND PRIMARILY RESPONSIBLE FOR THE ACCIDENT

Amazingly, Diamond starts its brief stating that there are only two possible causes of the accident involving Mr. Theriot: (1) Theriot's failure to follow safety procedures and/or (2) third-party failure to prevent the pipe that impacted him from falling off the "skate."  Such statements reflect Diamond's cover-up of the true facts surrounding the accident, its abhorrent investigation into the facts of the accident, and its callous indifference to the complaints made by crew-members on board the OCEAN VICTORY, both before and after the accident which created the septic environment and made the crew-members fearful to voice any complaints.  It was this fear that led crew-members to say nothing although they saw first-hand that the skate operator was not paying attention to his duties.  It was these actions, which led to the accident and which expose Diamond to punitive damages for their own callous actions.

---

[21] *Johnson v. Am. Interstate Ins. Co.*, No. CIV.A. 6:08CV1988, 2010 WL 3802451, at *1 (W.D. La. Sept. 20, 2010), attached hereto as Exhibit K.

The testimony of Wade Theriot and the witnesses to the accident paint a fairly clear picture as to what transpired on the day of the accident. The bullet points are supported by the overwhelming testimony of each and every witness to the accident including the Diamond hands that were within mere feet of the accident both during operations and when Wade Theriot was ultimately struck by the joint of casing.

- Wade had substantial experience in both running casing into the hole and pulling casing out of the hole.[22]
- Wade was keenly aware that while there were operations ongoing utilizing the skate that no one was to walk within the stump and skate as that was a no go zone.[23]
- The OES employees recalled that the top drive or the single joint elevators had gotten hung up in the girt on two prior occasions on the day of the accident and that he and OES crew believed that the reason for that was that the driller was coming down with the top drive too fast and was out of sync with the skate operator.[24]
- David Vincent, the OES crew chief, had discussed the problems between the driller and the skate operator with the driller on two separate occasions prior to the accident.[25]
- When the joint of casing that eventually struck him was pulled from the hole, Wade was near the panels on the opposite side of the drill floor than the tongs.[26]
- After that joint of casing had been detached from the string of casing Wade saw a Diamond hand struggling with the tongs and went over to assist in securing the tongs.[27]
- Wade then proceeded to walk in between the joint of casing and the stump to assist the individuals working the tongs.[28]
- When Wade walked in between the stump and the skate the joint of casing was suspended by the top drive and the Diamond crew was putting the thread protector onto the joint of casing.[29]
- Wade was clear that he would not have walked in between the skate and stump if the drill crew was in the process of loading the joint of casing onto the skate.[30]
- Wade did not see the joint of casing getting pushed onto the skate and had no idea that process had started as he was assisting with the tongs.[31]

---

[22] Deposition of Wade Theriot, attached hereto as Exhibit L, pages 38-39, 66-68
[23] Id; pages 133-136.
[24] Deposition of Clint Henry, attached hereto as Exhibit M, pages 52-54; Deposition of Daniel Henry, attached hereto as Exhibit N, pages 24-25, 28.
[25] Exhibit N, Deposition of Daniel Henry, page 25; Exhibit M, Deposition of Clint Henry pages 53-54; Deposition of David Vincent, attached hereto as Exhibit O, pages 73-74.
[26] Exhibit L, Deposition of Wade Theriot pages 99-100.
[27] Id.
[28] Id., 107-108.
[29] Id., 107-108; *see also,* Exhibit D, Deposition of William Rousseau, pages 92-95.
[30] Exhibit L, Deposition of Wade Theriot, pages 133-136.
[31] Id., 109-111.

- At the moment Wade was finished assisting with the tongs the joint of casing came off the skate and towards Wade and he had no time to react and tried to get out of the way and was struck by the joint of casing and the stump.[32]

As the indisputable facts make clear, Wade Theriot was in the process of assisting with the tongs when two Diamond employees were placing the thread protectors on a joint of casing that had been separated from the string.  At that moment, the joint of casing was hanging perpendicular to the drill floor and there were no operations ongoing.  More importantly, the JSAs of both Diamond and OES, Theriot's employer, mandated that prior to moving the joint of casing onto the skate that the driller had to ensure that all operations on the drill floor had ceased and that all men were aware that the joint of casing was being moved and looking up.[33]  The driller himself testified that he had to look out to the drill floor to make sure that all operations were stopped and that all men were looking up prior to him lowering the joint of casing onto the skate.[34]  The testimony of all personnel on the drill floor makes clear that the driller failed to do this and at the moment he started lowering the joint of casing onto the skate that Wade Theriot was assisting other personnel with the tongs.  Further, the JSAs made clear that when a joint of casing was being moved onto the skate that a v-door or tail rope should have been utilized to prevent the joint of casing from swinging back to the drill floor.[35]  If either of these instructions had been followed, the accident would never have happened.

In addition to the above acts of Diamond, William Rousseau, a Diamond employee, made clear that the accident was the direct result of the careless actions of the skate operator, Robert Stanford:

---

[32] *Id.*, 115-116.
[33] See, JSA of Diamond for laying down casing that was gone over by the crew prior to starting the job that injured Wade Theriot, attached hereto as Exhibit P.  See also, JSA of OES for laying down casing that was gone over by the crew prior to starting the job that injured Wade Theriot, attached hereto as Exhibit Q.
[34] Deposition of Daniel Midkiff, attached hereto as Exhibit R, page 124-127
[35] See, Exhibit P, Diamond JSA, see also, Exhibit Q, OES JSA.

Q:      Any complaints about the way the driller or the skate operator were operating on that day prior to Wade's accident?

A:      In my opinion, Robert Stanford was not paying attention to what he was doing as much as he should have been.

Q:      On the day of the accident?

A:      Correct.

Q:      Why do you say that?

A:      He seemed to be in a hurry.

Q:      Did you call that to anybody's attention?

A:      Several people noticed it.

Q:      So several people on the rig floor noticed that Robert Stanford seemed to be in a hurry?

A:      (Witness nods head affirmatively.)[36]

                                    ***

Q:      You said several people noticed that he was operating too fast; correct?

A:      At least two more other than myself.

Q:      Okay.  Who were those two people?

A:      David Brewer, James Coleman.

Q:      How do you know?

A:      I spoke with them about it.

Q:      Okay.  When did you speak with them about it?

A:      As soon as I noticed it.

Q:      Okay.  So I'm assuming this happened prior to the accident, noticing it and talking about it.

A:      Yes.[37]

                                    ***

Q:      The first time you noticed this, was it before lunch or after lunch?

**A:      After lunch.  After lunch.**

**Q:      After lunch and before the accident involving Wade Theriot?**

**A:      Correct.**

**Q:      And what did you do at that point?**

---

[36] Exhibit D, Deposition of William Rousseau, page 69.
[37] *Id.,* page 70.

**A:      I asked both of my -- both of my co-workers, David Brewer and James Coleman, if they noticed anything different about Robert Stanford.**

**Q:      And what did they say?**

**A:      They said yes.**

Q:      And did they say that they noticed that he was working too fast?

A:      Yes.[38]

***

Q:      So the two people close to your proximity was James Coleman and --

A:      David Brewer.

Q:      -- David Brewer.  And they both noticed it as well.

A:      Correct.

Q:      And then shortly thereafter, the accident happened.

A:      It wasn't long after that.[39]

***

**Q:      All right.  At the time, he was -- At the time of the accident, you believe Robert Stanford was going too fast?**

**A:      He wasn't paying attention.   He wasn't even looking when the accident occurred.**

**Q:      Okay.  He wasn't -- What was he looking at?**

**A:      He was looking out the rig floor when he should have been looking at -- at the piece of equipment he was running.**

**Q:      Okay.  And you believe that was the reason the accident happened?**

**A:      Absolutely.**

**Q:      So the accident happened --**

**A:      It was a chain of event, you know.  It did get hung in the derrick, but Danny stopped as he was coming down because he heard -- in my personal opinion, because he heard the guy hollering that was going on after it got hung.  David Brewer was the first one to holler, "Stop." At that point, you know, Danny Midkiff stopped.  He quit coming down with the casing pipe on the top drive. Robert Stanford continued to move backward, as if to lay the pipe down. David Brewer hollered again, "Stop." Robert Stanford was the only one still moving.   He was the only one still operating equipment.   David Brewer hollered a third time, "Stop," even louder.  By then, it was too late.  The pipe had come off the skate.**

---

[38] *Id.,* pages 71-72.
[39] *Id.,* page 74.

17

**Q:** If Robert had been paying attention to what he was doing, he would have heard David Brewer in your opinion?

**A:** In my opinion, yeah.  Absolutely.  Everyone heard him.  Danny -- Danny stopped because he heard Dago hollering from outside, and Danny was even farther away indoors when he heard David Brewer holler.  David Brewer was not quiet at all when he hollered.  He was very clear, very loud, "Stop."[40]

\*\*\*

**Q:** Fair.  Now, you, James Coleman and David Brewer talked earlier.  Now, your words were he said, "It was Bamma's fault."  David Brewer said that; correct?

**A:** Absolutely.

**Q:** What did James Coleman say in that meeting with just the three of you?

**A:** Same thing.  He believed that Bamma was mostly to blame for that.

**Q:** "Bamma" being --

**A:** Robert Stanford.[41]

William Rousseau's testimony could not be any clearer; Robert Stanford was acting strangely, was not paying attention to what he was doing, and his negligence was the primary reason for the accident.  That testimony is consistent with the testimony of the OES employees' that the driller and skate operator were not in sync and that Wade Theriot did nothing wrong.  Further, William Rousseau's testimony establishes that everyone on the drill floor, including the two other Diamond hands, noticed that the driller and skate operator were not in sync and more importantly that each one of them placed the majority of fault on Diamond.

More importantly, based on the testimony of Rousseau all of the Diamond employees on the drill floor who directly witnessed the accident placed the majority of the blame on Robert Stanford.  However, those facts never made it into the incident investigation because Diamond blatantly ignored those facts and instead tried to blame the accident on Wade Theriot as it did in

---

[40] *Id.*, pages 74-76.
[41] *Id.*, page 138.

its brief to this Court.  The facts surrounding the investigation, however, pain a clear picture of a cover-up.

## DIAMOND'S CALLOUS INDIFFIRENCE

Prior to getting to the cover-up, however, Plaintiff has to rewind the clock to illustrate Diamond's callous indifference to the conditions on board the OCEAN VICTORY prior to the accident to show that this accident was made possible by the actions of a bully and an apathetic crew along with supervisory personnel who simply turned a blind eye to what was going on aboard the OCEAN VICTORY.  That bully was Robert Stanford, the skate operator involved in this accident:

> Q:     What problems did you have with Mr. Stanford?
>
> A:     I had issues with Mr. Stanford.  He had a general dislike for people.  He liked to cuss a lot.  He liked to degrade people, talk down to individuals in a real aggressive manner.  He was a pretty threatening individual as far as his demeanor.
>
> Q:     Any other complaints about Mr. Stanford other than being aggressive and threatening?
>
> A:     I had a lot of issues with Mr. Stanford.
>
> Q:     Okay.  Did you think he was a good employee?
>
> A:     Absolutely not.[42]
>
>                                        ***
>
> Q:     What did he do?  Is it just the way he talked to you?
>
> A:     He insulted me constantly.  He tried to -- He tried to discredit me to my supervisor's eyes.  He made false accusations about me from day one.  He had a general disliking of me and made it clear, made it known and made my life miserable while I was at work.  Anything he could do to make my job more difficult, he did it.  Like I said, he was very aggressive.  He had a pretty loose tongue.  He cussed a lot.  He didn't talk to me, like you would talk to someone that you had a mutual respect for as an employee, and that was acceptable in my supervisor's eyes.  It was okay and it was -- let it go on for quite a while.[43]

---

[42] *Id.,* pages 28-29.
[43] *Id.,* pages 30-31.

William Rousseau explained that in order to address the conditions on the OCEAN VICTORY that he went up the chain of command complaining about Robert Stanford but that nothing was done. Rousseau complained to the assistant driller, Earl Barkley, he complained to two drillers, James Benoit and Daniel Midkiff, complained to two toolpushers, Lloyd Ford and Jeff Evans, and to two OIMs, Alfred Hovermale and Steve Blackwell. Amazingly, the behavior got worse with each complaint.[44]

> Q:    So the harassment, all of this stuff started within about a month of you being onboard; correct?
>
> A:    Yeah.
>
> Q:    And then six to eight months later is when you make your first complaints. Did I understand that correct?
>
> A:    Correct, correct.
>
> **Q:    And it got worse for a period of about a year, you said.**
>
> **A:    Yeah, it was pretty bad.[45]**
>
> ***
>
> Q:    Did it ever get close to a fistfight?
>
> A:    Oh, yeah.
>
> Q:    So he hit you one time on the hand?
>
> A:    Yep.
>
> Q:    Like a punch, nailing or what?
>
> A:    Not a punch. It was an open-handed slap, but it was repeated.
>
> Q:    So he repeatedly did that to you?
>
> A:    Correct.[46]

William Rousseau's testimony as to what he was made to endure on the OCEAN VICTORY absolutely shocks the conscience. What is most troubling, though, is that Diamond's management did absolutely nothing about it. Because of this, William Rousseau began taping conversations he was having with various people so that he could substantiate the complaints he was making.

---

[44] *Id.,* pages 34-47, and 151-152.
[45] *Id.,* page 35.
[46] *Id.,* pages 35-36.

Q:      There's no notes you took on the behavior of the complaints being made?

A:      Absolutely.

Q:      Oh, you have notes on that?

A:      Absolutely.

Q:      So you have a filing cabinet with notes about the complaints about --

A:      I have – I have voice-recorded messages of times that I have been talking to people, like Steve Blackwell, my supervisors, I recorded conversations we had for my own protection.

Q:      All right.  So you have -- How many voice-recorded messages do you think you have?

A:      I don't know, five to eight.

Q:      And those dealt with Robert Stanford directly?

A:      Uh-huh, yeah, the behavior that was taking place and how it affected me.[47]

                                        ***

Q:      So the only thing you have is the voice recordings.

A:      I have the voice recordings of when I went to my supervisor and the few meetings we had and the couple times I talked to certain individuals and conversations that took place.  I recorded a few of those, the ones I thought might be significant.  And this was -- This was just before me going to the office, you know.  This was -- This took place about two hitches, two months prior to me going to the office and having a meeting with HR and stuff.  I started doing this because it was getting really bad.[48]

William Rousseau made it clear that working conditions on board the OCEAN VICTORY were made miserable by the actions of Robert Stanford.  He further testified that he was not the only employee whose life was made miserable by Mr. Stanford.

Q:      David Brewer was under the same type of harassment that I was under.  I witnessed that.  I can -- I know that for a fact.  He will tell you the same thing.  And that is the reason he quit.  David Brewer quit because he couldn't handle the pressures that they had put on him.  He verbalized that to me personally on several occasions.  He left because, you know, he had been harassed constantly.  So we were kind of in a position to where our opinions were just our opinions, regardless of the topic, regardless of how serious the matter was.  It was -- They were just our opinions.[49]

---

[47] *Id.,* page 50.
[48] *Id.,* pages 50-51
[49] *Id.,* pages 133-134

William Rousseau's testimony paints an unsavory picture of an abusive co-worker and an upper management that simply did not care.  Further, William Rousseau made it clear that he had contacted Diamond's on shore personnel on at least 4 separate occasions prior to the accident trying to advise them of the conditions on board the OCEAN VICOTRY.[50]  Like the personnel on the OCEAN VICTORY, Diamond's management personnel did nothing.  Diamond's callous indifference created an environment where everyone was scared to say anything.  Thus, when he and his co-workers noticed that Robert Stanford was not paying attention to his job duties and possibly on drugs at the time of the accident, they did not go to either Mr. Stanford or the driller to voice those concerns although the problems were apparent enough that they all had ample time to discuss it amongst themselves.[51]  Unfortunately, no one said anything to either Mr. Stanford or the driller and Wade Theriot paid a heavy price for Diamond's callous indifference to complaints levied by its own employees.

### <u>DIAMOND'S ACTIONS IMMEDIATELY FOLLOWING THE ACCIDENT</u>

While Diamond's actions prior to the accident were callous and indifferent, their actions following the accident paint a clear picture of a calculated attempt to try and absolve itself of any liability in this matter despite overwhelming evidence that they were solely at fault for the devastation they have caused upon Wade Theriot.

Shortly after the accident, Diamond's safety representatives called a meeting with all of the witnesses of the accident to determine what happened.  Mr. Rousseau explained that because of his prior history with Mr. Stanford and based on the fact that upper management on the rig had ignored his complaints that he did feel it appropriate to state in an open forum that he believed the

---

[50] *Id.*, pages 151-152.
[51] *Id.,* page 74.

accident was primarily the fault of Robert Stanford.   On this point, Mr. Rousseau testified as follows:

> Q:     After this accident, you didn't want to go tell the problem with Robert Stanford that you saw because you didn't want to jeopardize your own employment; correct?
>
> A:     Correct, because I had already made complaints in the past and nothing happened, nothing came of it, you know.  I had made significant -- You know, I had requested to speak to people in HR.  I had asked for transfers. I had -- For six months, **I had made four phone calls to the office prior to the accident**, you know, about these conditions and the situations I was encountering with Robert Stanford, you know, about leaving that rig, if there was any -- at all possible. **I had a lot of issues with him, and I went to management and they didn't do anything about it.**  So that is when I called the office and spoke with them and nothing was ever done.  **So for me to voice my opinion to the same exact management, you know, in my personal opinion, what good would it have done, you know?**  And when I had a meeting with HR in Houston, I brought this particular incident up.  I spoke with them that I personally believed that Robert Stanford was -- **The majority of the blame lies on him, you know, because, you know, his mental state that night, you know.  And I didn't have a lot of time to react.  I didn't have a lot of time to analyze the situation to enact stop-work authority.  I was still trying to figure out, you know, exactly what was going on with him, you know.**[52]

William Rousseau also made it known that David Brewer did not go beyond the driller and the assistant driller for similar reasons:

> Q:     So James Coleman was in the meeting with you and David Brewer when David Brewer said it was [Robert Stanford's] fault?
>
> A:     Oh, yeah, yeah.
>
> Q:     But he didn't – In that meeting with everyone present, he didn't say that specifically?
>
> A:     No he didn't make it – he didn't address everyone with his opinion.
>
> Q:      Okay.  Do you know if he ever –
>
> A:     David Brewer was under the same type of harassment that I was under.  I witnessed that.  I can -- I know that for a fact.  He will tell you the same

---

[52] Deposition of William Rousseau, pages 151-152.

thing.  And that is the reason he quit.  David Brewer quit because he couldn't handle the pressures that they had put on him.  He verbalized that to me personally on several occasions.  He left because, you know, he had been harassed constantly.  So we were kind of in a position to where our opinions were just our opinions, regardless of the topic, regardless of how serious the matter was.  It was -- They were just our opinions.[53]

While neither William Rousseau, David Brewer or James Coleman had the courage to come forward in the group meeting and advise that the accident was primarily the fault of Robert Stanford, the day following the accident they all did advise both the driller, Daniel Midkiff, and the assistant driller, Earl Barkley, that they believed the accident was Robert Stanford's fault.[54] Specifically, Mr. Rousseau explained that the day following the accident that he, David Brewer and James Coleman had a meeting in the driller's shack with Daniel Midkiff and Earl Barkley werein they advised that Robert Stanford was primarily responsible for the accident.[55]  Further, William Rousseau testified that he also told his toolpusher, Lloyd Ford, the employee above the driller, and the OIM, Steve Blackwell, that he believed Robert Stanford was responsible for the accident.[56]   Shockingly, and just like Mr. Rousseau's prior complaints, his statements with respect to the accident also fell on deaf ears.  In fact, in the Incident Investigation Report, Diamond set forth that the accident was solely the fault of Wade Theriot:

> The incident occurred at 21:00 hrs on 21/Feb/13.  The IP had assisted with casing tong.  A joint of casing was pushed on the truck the IP was walking between the truck and stump when the joint come off the truck striking the IP between the joint and stump.  **IP was in the wrong position**.  The IP was struck between casing stump and casing joint off the truck.  The IP was took [sic] to SDR for evaluation and was sent in for treatment.[57]

---

[53] *Id.,* pages 133-134
[54] *Id.,* pages  116-133, and 145-152.
[55] *Id.,* pages 145-152.
[56] *Id.,* pages 157-158.
[57] *See,* Incident Investigation Report, attached hereto as Exhibit S.

William Rousseau's testimony paints a very clear picture.  Mr. Rousseau and others, including David Brewer, were physically and verbally assaulted by Robert Stanford.  Those actions were allowed to continue despite repeated complaints to management and at least 4 phone calls to Diamond's office.  Unfortunately, the harassment they were subjected to only got worse with the ongoing complaints.  It was that harassment that caused Mr. Rousseau and Mr. Brewer not to say anything to anyone about the behavior they witnessed from Mr. Stanford on the night of the incident involving Wade Theriot.  More importantly, though, the reason they choose not to alert upper management of the true facts surrounding the accident was because that same upper management repeatedly ignored their complaints and allowed the behavior exhibited by Mr. Stanford to continue and even escalate.  That same upper management continued in its righteous indignation and continued to blame the accident on Mr. Theriot despite Mr. Rousseau doing nearly all he reasonably could be expected to do to alert Diamond's upper management that the accident was primarily the fault of Robert Stanford.

## DIAMOND'S CALLOUS INDIFFERENCE CONTINUED AFTER THE ACCIDENT

As time went by following the accident, the assaultive behavior exhibited by Robert Stanford and others continued to escalate.  It eventually caused David Brewer to resign his employment with Diamond.  Mr. Rousseau, however, finally had enough and voiced his concerns to Diamond's HR department in Houston.  Mr. Rousseau initially spoke via phone with Diamond's legal counsel, Chip Rice, and later Ms. Gabriele Ortiz, an HR employee, again by phone, who memorialized Mr.  Rousseau's complaints in an inter-office memorandum.  These discussions came on September 8, 2010.  Mr. Rousseau's complaints included the following:

- Rousseau was physically assaulted by Robert Stanford.
- Rousseau was threatened with physical assault by Otis McDaniel, a member of Diamond's drill crew.

- Earl Barley, the assistant driller, was allowed to drink while on the clock on one occasion and had bragged about it.
- Rousseau advised that HSE documents (Job Safety Analyses) had been falsified and JSAs were being "pencil-whipped" and not properly covered.  Rousseau advised that the only time JSAs were done is when third parties were present.
- Rousseau advised that he had requested a transfer earlier in the year but did not think that he should be the one to leave the OCEAN VICTORY.
- That Mr. Rousseau had audio tapes that confirmed his allegations.[58]

Sometime later, presumably shortly after the September 8, 2014 phone call, Mr. Rousseau showed up at Diamond's headquarters in Houston to discuss his complaints.  In their *Motion for Partial Summary Judgment,* Diamond attempts to paint a picture wherein Diamond acted proactively in order to schedule this meeting with company personnel including HS&E, HR and operations to address Mr. Rousseau's concerns, that the meeting had nothing to do with Wade Theriot's accident and that Diamond took all reasonable measures to ensure that it remedied any problems that might persist.  Such statement is laughable.  The best that can be said of Diamond's efforts here is that they saw Mr. Rousseau as having ulterior motives and did little more than pay him lip service and then went on about their business.  And the testimony of both Neil Hall and John Richards, the two Diamond Vice Presidents who were at the meeting that were produced for deposition, absolutely confirms this fact.

First, and despite going up the chain of command on board the OCEAN VICTORY, calling Diamond's office on multiple occasions, and having phone conversations with both Diamond's legal counsel and Diamond's HR department, neither Mr. Hall, Diamond's VP of HS&E, nor Mr. Richards, VP of Operations, had any knowledge of Mr. Rousseau or his alleged complaints before being advised that Mr. Rousseau had actually shown up at Diamond's Corporate Headquarters wanting to discuss his ongoing complaints regarding the OCEAN VICTORY.[59]  Amazingly, prior

---

[58] *See,* Exhibit C, Interoffice Memorandum following William Rousseau's call to the HR Department.
[59] See, Exhibit A, Deposition of Neil Hall, page 26; *see also,* Exhibit B, Deposition of Jon Richards, page 29.

to his deposition on May 19, 2016, Neil Hall, the VP of HS&E had never even seen the interoffice memorandum setting forth the specific complaints that Mr. Rousseau had regarding the behavior being allowed to continue on the OCEAN VICTORY.[60]

### A.  Mr. Hall's Recollection of the Meeting

First and foremost, Mr. Hall had a sketchy recollection of what transpired at the meeting because he did not take any notes and was not aware if anyone had taken any notes of the complaints being levied by Mr. Rousseau.[61]  When asked what he could recall about the meeting with Mr. Rousseau, Mr. Hall set forth that he recalled there being an allegation that an employee was allowed to drink while on the clock, that there was some bad harassment going on and that the skate operator involved in the Wade Theriot accident was the main culprit, that Mr. Rousseau made an allegation that the skate operator and some other members of the rig were abusing Adderall, that another employee had resigned because of the working conditions on board the OCEAN VICTORY and that Diamond should speak with that person, and that Mr. Rousseau had been taping conversations with various individuals on the rig to substantiate his allegations.[62] When Mr. Hall was specifically asked about whether or not he investigated the complaint set forth in the memo that HS&E documents had been falsified he testified that he had never heard of any HS&E documents being falsified and if that was ever brought to his attention that he would have taken action on it.[63]   Amazingly, Mr. Hall admitted that he had never seen the interoffice memorandum prepared prior to the meeting with Mr. Rousseau and that the first time he had ever even seen the memorandum was at his deposition.[64]  As for the allegation in the memorandum that

---

[60] Exhibit A, Deposition of Neil Hall, pages 26 and 62.
[61] *Id.,* pages 27-28.
[62] *Id.,* pages 28-33, 35-44, 44-46, 40, 36, and 62-74.
[63] *Id.,* 62-74.
[64] *Id.,* 26.

there were physical altercations on the rig, Mr. Hall testified that he was unaware of that but that such an allegation should have prompted an immediate investigation by Diamond.[65]

Now, recall that Mr. Hall is the VP of HS&E and that Mr. Rousseau specifically claimed that there were falsified HS&E documents, Mr. Hall testified that he did not do anything to follow-up on the complaints levied by Mr. Rousseau.[66]  He did not speak with anyone on the OCEAN VICTORY or any else for that matter.[67]  He did not even ask to listen to Mr. Rousseau's audio tapes although he testified that Mr. Rousseau advised that the reason the tapes were made is because Mr. Rousseau was not being listened to and that Mr. Rousseau wanted to have some evidence to back up what was actually being done on the OCEAN VICTORY.[68]  One would think that such a statement would have sparked an interest in the tapes.  NOPE.  Mr. Hall testified that it was his understanding that Mr. Richards was taking the lead on the investigation and that all he, Mr. Hall, ever did was speak with Mr. Richards while passing in the hallway to ask if anything ever came of the investigation.[69]

### B.  Mr. Richard's Recollection of the Meeting

Mr. Richards, the VP of Operations, testimony of the meeting was mostly consistent with that of Mr. Hall's, but there were some very important differences.  Like Mr. Hall, Mr. Richards' recollection was sketchy because he had not taken any notes and despite stating that it would be customary for someone with HR to take notes, was not aware if that had been done and Diamond has produced no notes from that meeting.[70]

---

[65] *Id.,* 35,  and 57-61.
[66] *Id.,* 62-68.
[67] *Id.,* 73-75.
[68] *Id.,* 36.
[69] *Id.,* 73-74.
[70] Exhibit B, Deposition of John Richards, pages 30-31.

Moving on to what Mr. Richards could recall, before being prompted as to the specific complaints, Mr. Richards testified as follows:

> Mr. Rousseau basically came to the office and expressed concern that he felt mistreated on the OCEAN VICTORY.  He said that he – because he wasn't a – friends or buddy-buddy with his crew that he felt like they picked on him and he didn't always receive fair treatment, that he was concerned there was an effort underway to possibly have him removed from the rig or the company.  That was my general recollection of his statements and the fact that because he wasn't one of the them or enjoyed the same hobbies the did, he felt like he was singled out at times because of it.[71]

Following that testimony, and again before undersigned went to the specific allegations Mr. Rousseau discussed at his deposition or the complaints in the memorandum, undersigned inquired into what Mr. Richards did to investigate the complaints made by Mr. Rousseau.  Mr. Richards advised that he sent an email to the OIM and the ops manager stating that Mr. Rousseau was concerned about his treatment and that Mr. Rousseau had further advised that there was an incident of an employee drinking while on the clock and that such allegations needed to be looked into.[72]  Not surprisingly, and despite repeated requests, Diamond has failed to produce that email.[73]  That said, Mr. Richards advised that a day or two later he received a call back from the OIM that the OIM had looked into the allegations and found no evidence to support the claims and the OIM called a meeting with the crew to reset expectations on the rig. [74]

Mr. Richards testimony here was amazing.  There was no true investigation performed and Diamond continued to simply ignore the allegations of Mr. Rousseau.  Diamond's VP of Operations and the VP of HS&E did practically nothing.  They asked the same individual(s) who

---

[71] *Id.,* pages 33-34.
[72] *Id.,* pages 33-39.
[73] *Id.,* page 36. Any and all correspondence dealing with the meeting and Diamond's investigation of it have been requested and this email has never been produced.
[74] *Id.,* pages 33-39.

had repeatedly ignored Mr. Rousseau to see if there was any validity to the complaint that people were being mistreated.  Within a day, at most two, there was a phone call and the investigation closed.  Such efforts are comical and yet Diamond argues to the Court that they took due and diligent efforts to look into the complaints and make sure they were remedied.

Moving on, once Mr. Richards had testified as to what he could independently recall, he was pressed on some of the items contained in the inter-office memorandum and on some of the things that Mr. Rousseau testified to.  Mr. Richards was asked whether or not Mr. Rousseau voiced any complaints about Adderall abuse to which Mr. Richards admitted was a topic at the meeting.[75] Mr. Richards then testified that he had his people look into that and that when they reported back they had not found any merit to those allegations.[76]  That too, according to Mr. Richards, was able to be done within a day or two.  Mr. Richards did testify, though, that he believed Diamond had random drug tests were performed on the crew as a result of Mr. Rousseau's complaints but that he was not aware of the results.[77]  Those tests, like the email to the OIM, have been requested but yet Diamond has failed to produce the results.

Next, Mr. Richards was asked about the allegation in the memorandum that stated that Mr. Rousseau was physically assaulted by Mr. Robert Stanford.  Mr. Richards said he did not recall that allegation and testified that he simply found such allegation "hard to believe" as such an assault would be a federal offense.[78]  He went on to state that in all the years he had worked offshore rigs that a physical assault "very, very rarely occurs."[79]  Mr. Richards' testimony makes

---

[75] *Id.,* 45-47.
[76] *Id.,* 45-53.
[77] *Id.*
[78] *Id.,* 55.
[79] *Id.,*

clear that he did not share Mr. Hall's sentiment that such an allegation should be inquired into by Diamond and that it was easier to just excuse that as a lie.

As to the allegation that there was another employee that quit as a result of these abuse being levied on him, Mr. Richards testified that he did recall that complaint.[80]  He specifically recalled Mr. Rousseau stating that he had a co-worker who quit because he felt the same way as Mr. Rousseau.  When asked if he tried to reach out to that individual, Mr. Richards testified that typically there is exit interviews conducted but that he had not personally reached out to that individual.

The above facts alone establish that Diamond wholly dropped the ball with respect to the allegations being made by William Rousseau.  While they alone establish a callous indifference on the part of Diamond as a corporate entity, there are a few of the allegations that warrant closer inspection.

### i.    JSAs Being Pencil Whipped

Recall from above that William Rousseau had specifically advised the HR department that JSAs were not being properly performed and were being pencil-whipped.  Neil Hall, the VP of HS&E testified that he had never been made aware of that complaint but that if such a complaint had been made that it should surely be investigated by Diamond.  We know, however, that such complaint was made because it was contained in the interoffice memorandum and Mr. Richards specifically testified that he recalled Mr. Rousseau advising that JSA were not always being done and that in one instance the crewmembers had to go back and postdate a JSA because someone got hurt when a JSA had not been done.[81]  Mr. Richards testified that on that specific incident that the

---

[80] *Id.,* pages 53-54.
[81] *Id.,* pages 56-58.

individual who was allegedly hurt was Hunter Johns.[82]  However, Mr. Richards testified that he had someone look into whether there was an accident with anyone by the name of Hunter Johns and they could not find evidence of that.[83]  Accordingly, he said that they could not connect the dots there.  However, Mr. Richards did confirm that there was an employee by the name of Hunter Johns.  The only logical question became whether they ever contacted Mr. Johns to determine the veracity of this allegation and Mr. Richards confirmed that no one had ever done that.[84]

Again, Diamond's efforts here showed a callous indifference.  Further, the complaints levied by Mr. Rousseau, at a minimum, support an inference that JSAs were not being properly conducted by crewmembers on board the OCEAN VICTORY.  That is of paramount importance here.  Specifically, both Mr. Richards and Mr. Hall confirmed that JSAs are of the utmost importance and their steps need to be followed to ensure the safety of all on board the rig when doing a specific task.[85]  Further, their testimony confirmed that in many instances a third party JSA will be more specific than a Diamond JSA when doing the tasks a third party is being called upon to assist with and in those situations the JSAs of the third party should be followed.[86]  A perfect example of that is the accident involving Wade Theriot.  Specifically, the Diamond JSA that was used for pulling casing called for the use of a crane and did not cover the steps involved when a skate was being utilized.[87]  In this case, the crane was not being utilized and instead the crew was utilizing the skate.  That fact is of paramount importance because the OES JSA did cover the use of a skate and specifically stated that when a skate was being utilized the casing joint needed to be secured by use of a v-door rope to ensure that the skate could not swing back towards the stump.[88]

---

[82] *Id.,* pages 56-58.
[83] *Id.*
[84] *Id.*
[85] *Id.,* page 24.
[86] *Id.,* pages 24-25.
[87] *See,* Exhibit P, Diamond JSA.
[88] *See,* Exhibit Q, OES JSA.  This instruction is contained in Step 16 in OES' JSA.

Further, the operations of pushing the skate was being conducted solely by Diamond employees and they did not follow that step and did not use a v-door rope to prevent the joint of casing from swinging back to the rig floor and striking an employee.  If it had, we would not be here today.

Further, and more importantly, the facts absolutely support Mr. Rousseau's complaints that JSAs were not being properly covered.  Had Diamond heeded the warnings of Mr. Rousseau, they would have been aware that their own employees were not properly covering and following the JSAs and would have mandated such.  Had that been done, Mr. Theriot would still be working today.

### ii.   Prescription Drug Abuse.

Mr. Rousseau's complaints further support an inference that there was rampant drug abuse, specifically the abuse of Adderall, by members of the OCEAN VICTORY.  Further, Mr. Rousseau specifically stated that the main culprit was Robert Stanford.[89]   Knowing this, the Court is reminded of Mr. Rousseau's testimony that three of the Diamond employees on the day of the accident specifically noticed that there was something wrong with Mr. Rousseau.  Such facts support an inference that Mr. Rousseau may have been under the influence of Adderall at the time of the accident.  This is further supported by Mr. Richards' statement in his deposition that the following the accident the operations manager was interested in the post-accident drug screening.[90] Unfortunately, we will never know if Mr. Stanford was in fact under the influence of Adderall at the time of the accident as Diamond did not have the post-accident drug screens performed until February 26, 2014, a full five (5) days after the accident.[91]  Such tests would never have been able

---

[89] Exhibit B, Deposition of Jon Richards, pages 45-36; Exhibit A, Deposition of Neil Hall, pages 44-46.
[90] Exhibit B, Deposition of Jon Richards, pages 42-43.
[91] *See,* Exhibit F, Drug Test Results evidencing that samples not obtained until February 26, 2016, five (5) days after the accident involving Wade Theriot.

to detect whether or not Mr. Stanford was in fact under the influence of Adderall at the time of the accident.

### iii.   Audio Tapes

Recall from above that Mr. Rousseau had recorded several conversations he had with various individuals in order to substantiate his complaints and protect himself.  Mr. Rousseau advised the HR department of this fact prior to his meeting and specifically advised both Mr. Hall and Mr. Richards of this fact.  One would surmise that if Diamond was proactively trying to investigate Mr. Rousseau's complaints that Mr. Hall and Mr. Richards would have wanted to hear those audio tapes to determine if any facts that Mr. Rousseau had alleged had any merit.  Such an assumption would be incorrect.  When Mr. Hall was queried on this topic he actually stated that it was his understanding that Mr. Rousseau had made these tapes so that when he came to the office that he would have evidence to back up his statements.[92]  Such inference, however, did not spark Mr. Hall to actually listen to the tapes.[93]  Mr. Richards testified that he recalled that Mr. Rousseau had advised that he had some audio recordings that could back up his statements but like Mr. Hall, Mr. Richards had not listened to the audio tapes nor had he asked to hear them.[94]

### iv.   Accident Involving Wade Theriot and Cover-Up

The above evidence clearly supports an active cover-up of the true facts of the accident. However, the testimony of both Neil Hall and Jon Richards absolutely confirms that fact.  Mr. Rousseau specifically testified on this as follows:

> Q:   Okay.  When you talked with HR, human resources, in this meeting, you said five or six people were there, but you don't remember their names; right?
>
> A:   I remember Neil Hall specifically.
>
> Q:   In that meeting, there were five or six people; correct?

---

[92] Exhibit A, Deposition of Neil Hall, pages 34-37.
[93] *Id.*
[94] Exhibit B, Deposition of Jon Richards, pages 55-56.

A:      Correct.

Q:      So there – What did you specifically say about this incident we are here today about involving Wade Theriot?

A:      I just brought up the fact that there was an incident on the VICTORY where an OES employee had gotten hurt, and I believed that one of the primary people that I was there to complain about was, in my opinion, mostly responsible, at least fifty percent responsible for what had occurred.  And they remembered the incident.  We spoke about the incident.  They asked me then why I didn't go to management immediately, and I explained my situation, just like I have now –[95]

Mr. Rousseau's testimony makes clear that he advised both Neil Hall and Jon Richards of that Robert Stanford was "mostly responsible" for the accident and that they queried him on why he had not gone to management to report this.  Amazingly, however, at their respective depositions neither Mr. Hall or Mr. Richards advised of any such conversations.  Mr. Hall specifically testified that they did talk about the accident involving Mr. Theriot but that all that was mentioned was that the individual driving the skate was the guy giving Mr. Rousseau the hardest time.[96]  Obviously, neither Mr. Hall nor Mr. Richards was listening to the fact that the same individual who was driving the skate was also primarily responsible for the accident as Mr. Richards went on to state that although he had never had any discussions with any of the direct witnesses to the accident or in any way involved in the accident investigation that "[t]he individual injured person had a significant lapse in judgment, thought process.  When you pick up or lay down casing, there is one area you should never find yourself in body position wise and he found himself in that position."[97]

Mr. Richards' testimony here is incredulous.  It absolutely ignores the testimony of every witness involved, ignores the JSAs that specifically covers the procedures in laying down casing, and directly contradicts the testimony of the Diamond witness, William Rousseau, who was

---

[95] Exhibit D, Deposition of William Rousseau, pages155-156.
[96] Exhibit A, *Deposition of Neil Hall,* pages 39-40.  Also, Mr. hall testified that the accident happened before he was the VP of HS&E and that he had not done any investigation into the accident or speak with the witnesses and all he had done was review the Incident Investigation.
[97] Exhibit B, Deposition of Jon Richards, pages 65-67; quote is on page 67.

standing closest to the accident and watched everything unfold.  Such testimony absolutely confirms either an intentional cover-up or a grossly negligent one. This fact is further confirmed by Diamond in their motion for partial summary judgment wherein they state that Mr. Hall's testimony confirmed that "the only mention of the accident was that the skate operator involved (Stanford) was the one giving Rousseau the hardest time (a bullying allegation."  Diamond has done everything it can to spin the facts in this case to one where Wade Theriot was simply in the wrong place at the wrong time.  Again, nothing could be further from the truth.  Diamond has continually ignored the truth and it is those actions that directly led to the accident in question.

v.     <strong><u>Ulterior Motives</u></strong>

Diamond's actions exhibit a callous indifference to the working conditions aboard the OCEAN VICTORY.  It is hard to fathom such an inept response to continued complaints of ongoing harassment being levied by Diamond personnel who are actively trying to make working conditions on Diamond vessels better for everyone.  Such response, however, is finally understood when one contemplates the prism through which Diamond viewed these complaints.  Specifically, in his deposition, Mr. Richard volunteered that he believed Mr. Rousseau had ulterior motives in voicing these complaints:

> Q:    There was one thing you said and I don't want to draw infrences.  That's why I want to ask the question.  You said that he [Mr. Rousseau] knew that his position was going to be soon ending.  Do you think that was the motivation for him to come and make these complaints?
>
> A:    I do.
>
> Q:    Okay.  So you think that –
>
> A:    He wanted – in my opinion he wanted it to be known that he felt like he was being picked on and part of what he was doing was to initiate a transfer to a rig that had more future than the OCEAN VICTORY because he as well as of his other co-workers knew that when the rig set sail in – you know, which was going to be Q1 of the following year.
>
> Q:    Quarter 1?

36

A:     Quarter 1. He knew they weren't going with the rig.

Q:     Okay.  So this was kind of at least an attempt to try to get off that rig and get on another rig as you –

A:     I think, I think, I think – he seemed like a smart guy and I think there was, I think there was some motivation to do something that would protect him.  Now I probably shouldn't be giving my opinions, but that's my opinion.[98]

Mr. Richards' testimony on this part was quite enlightening.  He never believed anything that Mr. Rousseau was saying and Diamond did nothing more than give Mr. Rousseau and his complaints lip service.  The only problem with Mr. Richards' testimony here, though, is that it is directly refuted by what Mr. Rousseau actually stated.  Specifically, Mr. Hall testified that Mr. Rousseau stated in the meeting that he did not want to leave the OCEAN VICTORY as he did not want to be seen as someone who voiced a complaint and then ran away.[99]  On this point it would have behooved Mr. Richards to actually read the interoffice memorandum from when Mr. Rousseau called the HR department to voice his complaints because he actually stated:

He did request a transfer earlier in the year, but doesn't feel as if he should be the one to leave.[100]

The evidence presented by Mr. Rousseau portrays very grave circumstances on board the OCEAN VICTORY that were called to Diamond's attention both before and after the accident.  Diamond choose to ignore these complaints and that is why we are here today.

## SUMMATION

The indisputable facts in this case establish that Diamond and its employees were solely responsible for the accident that nearly killed Wade Theriot and which completely shattered his pelvic region leaving him impotent and in need of several orthopedic surgeries.   And while Diamond tries to depict this as a case of simple negligence, nothing could be farther from the truth.

---

[98] Exhibit B, Deposition of Jon Richards, pages 61-62.
[99] Exhibit A, Deposition of Neil Hall, page 74.
[100] Exhibit C, Interoffice Memorandum.

Based on William Rousseau's testimony, which this court must accept as true for purposes of Diamond's motion for partial summary judgment. Diamond's actions were reprehensible and certainly amount to callous indifference to the working environment on board the OCEAN VICTORY. It was that working environment that directly led to the accident at issue and it is Diamond's actions alone that support an award of punitive damages. With that in mind, the Court is reminded that the issue being decided is not whether punitive damages are appropriate in this case. This is a motion for summary dismissal and Diamond bears the burden of proving that as a matter of law there are no facts that could possibly support an award of punitive damages. Diamond cannot meet that burden of proof and Plaintiffs pray that the instant motion be denied.

Respectfully Submitted:

**FREDERICK & BECKERS, LLC**

By:  /s/ Michael T. Beckers
    **Brent P. Frederick (#25053)**
    **Michael T. Beckers (#30197)**
    **Ryan N. Ours (#27735)**
    **Danielle N. Goren (#34563)**
    112 Founders Drive, Ste. 101
    Baton Rouge, LA  70810
    Telephone: 225-372-6000
    Facsimile: 225-372-6015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the *Memorandum in Opposition to Defendant's 12(f) Motion to Strike Punitive Damages Claim and Defendant's Motion for Partial Summary Judgment* has been served upon all interested counsel by ECF filing on July 11, 2016.

s/Michael T. Beckers
_____

**Michael T. Beckers**